753 A.2d 1190 (2000)
332 N.J. Super. 472
CASINO REINVESTMENT DEVELOPMENT AUTHORITY, a public corporate body of the State of New Jersey, Plaintiff-Appellant,
v.
Kenneth J. LUSTGARTEN and Robert B. Wolf, Trustees of the Trust under the Will of Hilda F. Lustgarten, Deceased, for Kenneth J. Lustgarten; Scott Lustgarten; Kenneth Kaiserman; Ronald Kaiserman; Constance Kaiserman Robinson; Donald A. Fuhrman and Rose C. Fuhrman, Trustees under the Will of Norman H. Fuhrman, Deceased; and Melvin L. Fuhrman, Defendants-Respondents, and
City of Atlantic City and Atlantic City Municipal Utilities Authority, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued April 3, 2000.
Decided July 5, 2000.
*1192 Peter D. Manahan, Roseland, for plaintiff-appellant (Connell, Foley & Geiser, attorneys; Mr. Manahan, of counsel and on the brief; Ernest W. Schoellkopff, on the brief).
John H. Buonocore, Jr., Morristown, for defendants-respondents (McKirdy and Riskin, attorneys; Mr. Buonocore, of counsel and on the brief).
Before Judges HAVEY, KEEFE, and COLLESTER.
*1191 The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiff, the Casino Reinvestment Development Authority, condemned 2020-22 Baltic Avenue, Atlantic City ("the Property"), owned by defendants Kenneth J. Lustgarten, Robert B. Wolf, Scott Lustgarten, Kenneth Kaiserman, Ronald Kaiserman, Constance Kaiserman Robinson, Donald A. Fuhrman, Rose C. Fuhrman, and Melvin L. Fuhrman. A jury determined the fair market value of the Property was $3,132,000.
*1193 Plaintiff contends on appeal that the judge erred in: (1) admitting the testimony of defendants' appraisal expert, Jon P. Brody; (2) admitting Brody's comparable sales; (3) excluding the report of plaintiff's expert, Angelo V. Stambules, on the economic feasibility of a hotel; (4) failing to properly instruct the jury on highest and best use; (5) refusing to allow it to serve upon defendants the supplemental report of its expert appraiser, Henry J. Mancini; (6) preventing plaintiff's other appraiser, Thomas P. Welsh, from testifying as to the highest and best use of the Property; and (7) putting unwarranted limitations on plaintiff's cross-examination of Brody. Further, plaintiff claims that (8) defendants' counsel made certain improper comments that prejudiced plaintiff's right to a fair trial. Finally, plaintiff claims that the trial judge erred in (9) preventing Welsh from testifying as a rebuttal witness. We conclude that the trial judge committed reversible error with respect to the last issue. Accordingly, we reverse the judgment under review and remand for a new trial. Nonetheless, we have discussed the other issues presented by plaintiff since our discussion will be of assistance to the trial judge on remand.[1]
The facts can be briefly stated for the purpose of this opinion. The Property, in the 2000 block of Baltic Avenue, is a level, vacant lot with 240 feet frontage along Baltic and 150 feet deep; it is Block 148, lots 2, 3, and 66, on the tax map of Atlantic City. The Property is rectangular-shaped and approximately 36,000 square feet or.83 acres. The only improvement to the Property is older concrete and asphalt paving from a prior use. Close to the Property is the Atlantic Plate Glass building,[2] a boarded-up clothing factory, and a fast-food restaurant, the Philly Steakhouse. The immediate neighborhood is predominantly light industrial.
The Property is within a block of the Atlantic City Convention Center, which the New Jersey Sports Exposition Authority received permission to develop in January 1992. Eleven months later, plaintiff declared its intention to condemn property in the nine blocks between the Convention Center and the Boardwalk, an area dubbed the "Corridor." The Property is within the Corridor. The construction on the Convention Center began in 1993 and as of June 30, 1995, the relevant appraisal date, construction was well-under way. The Convention Center was completed at the time of trial at an approximate cost of $258 million. The Convention Center, located on Kirkman Boulevard, has 500,000 square feet (11.5 acres) of contiguous exhibit space.
Plaintiff's expert, Henry J. Mancini, estimated that the Convention Center will generate $447 million in economic benefit to the city annually. He stated that current projections indicate that 500,000 to 750,000 people a year will visit the Convention Center. In Mancini's opinion, the Convention Center business primarily has a positive impact on the hotel, retail, and food industries. The Property is in the central business district zone ("CBD"), which is predominately a commercial zone that permits a wide variety of uses, including retail businesses, office buildings, hotels, and service parking lots.
Mancini testified that as of June 30, 1995, the fair market value of the Property was $32 per square foot, or a total value of $1,119,000 adjusted for removal of the existing concrete and asphalt. He included the impact of the Convention Center in forming his opinion as to the value of the Property. Mancini stated that on the valuation *1194 date, the Atlantic City real estate market was flat, with little in the way of private development, except for some casino expansion projects. The only development in the Corridor area was the construction of a bus parking lot in the mid-1980's at Michigan and Atlantic Avenues.
Mancini determined that, because the zoning affecting the Property is CBD, it is suitable for most commercial uses. The physical characteristics of the Property make it appropriate for a wide variety of commercial development: it is large, almost an acre; has sufficient footage on Baltic Avenue; and sufficient depth. As to financial feasibility, the Property is located on Baltic Avenue, which has a high traffic level and feeds into the Atlantic City Expressway. Also, it is located one block from the Convention Center. Finally, Mancini concluded: "So my ultimate highest and best use conclusion was a use which is legally permitted, physically possible, financially feasible, and maximally productive for this site and that use would be generally a use which is permitted by zoning and would be classified as a retail or service-oriented use." Mancini used four comparable sales to support his opinion as to the value of the Property.
Defendants offered the testimony of Jon P. Brody as an expert in the field of real estate appraisal. Brody testified that the dominant feature of the area is the Convention Center, which must be taken into account in valuing the Property. Brody considered the Property to be a large parcel in the CBD zone, which allows the greatest variety of potential uses and a building elevation of up to 220 feet. He concluded that the highest and best conforming use is as an assemblage parcel, which takes advantage of the proximity to the Convention Center, casinos, and the Boardwalk. This highest and best use, however, did not require that the Property be assembled with some other property; it could be used on its own or assembled with other property for development. He decided that the way to value the property is through the market approach. He used six comparable sales to support his opinion that the Property had a value of $90 per square foot or $3,240,000. Unlike Mancini, however, Brody made no adjustments to his comparable sales. This was one of the many controversies that arose at trial.
The jury verdict of $3,132,000 represented a value of $87 per square foot: $55 per square foot more than plaintiff's estimate and $3 less than defendants' estimate.

I.
Plaintiff contends that the judge erred in refusing to grant a pretrial hearing on the admissibility of the testimony of defendants' appraiser, Brody, or in refusing to exclude or strike Brody's testimony regarding the highest and best use of the Property. These contentions are grounded in plaintiff's core argument that Brody's appraisal assumes that the Property can be assembled into a larger parcel even though there is no reasonable probability that the Property can be assembled with other properties.
The most thorough explanation of why these motions were denied was given by the trial judge after he refused to strike a portion of Brody's testimony:
The second application asks me to determine that the jury should not have heard anything with respect to assembly because there's no reasonable probability that this property will be assembled.
The line of cases and the theory on which we're talking is essentially the line of cases that says the jury can't be instructed with respect to value attached to property as a result of a zoning variance unless it can be shown there's a reasonable probability that that zoning variance will be taken into account or will occur. But what we're really aiming for is what buyers and sellers in the marketplace will consider.
Here this value assigned to this property was not given to it on a condition that it be assembled. It was taken from *1195 direct sales comparisons with other properties and from those direct comparisons a value for this property was developed.
It's not necessary that this property be assembled for this value to occur. In fact some of the properties that were taken were similar in size with a similar value. There were properties that were part of assemblies that were used to compare this property, but that goes to the comps. It doesn't go to the question as to whether this property would have a premium if it were assembled....
We agree with the trial judge. Plaintiff's argument is flawed because Brody's valuation did not depend on the contingency of the Property being assembled. Initially, Brody testified that the highest and best use of the Property was "as an assemblage parcel taking advantage of the proximity, the location of that property, to both the Convention Center and to the casinos and Boardwalk." But later in his testimony he clarified his position. When asked whether the highest and best use of the Property depended on assembling it with other properties, Brody answered:
No, it does not, sir, but of course it makes sense, it makes logic, although the subject is 36,000 square feet, it certainly could stand on its own as an assemblage parcel or as a parcel that could be assembled, so there are two distinct concepts, but it certainly could go in either direction from the standpoint of me arriving at a value for that particular property.
Brody's method of valuing the property bears out his contention that his estimation of fair market value did not depend on the Property being assembled. Brody used the market method of valuation, comparing the Property to six other sales of property in Atlantic City. Most of the comparison sales were of parcels of land far smaller than the Property (only sale number two, when aggregated, was larger) and half of the comparables (except sales one, two, and three) were not bought as part of an assemblage scheme. Hence, the size of the Property and the probability of it being assembled was not crucial to Brody's estimate of its value. Further, Brody testified explicitly that the size of a parcel in Atlantic City is a far less important determinant of price than its location. He considered the Property to be in a strategic location because it is within a block of the new Convention Center and just as good as the comparable sales.
In any event, the size of the property, approximately 36,000 square feet, was more than enough land to support development for permissible uses in the zone. The usefulness of the Property in connection with an assembly with other land was merely one factor any buyer or seller would consider. Plaintiff's appraiser, Mancini, acknowledged the concept of assemblage when he undertook the evaluation of neighboring property. Indeed, his initial evaluation of the neighboring property considered its highest and best use as an assemblage for future development as any of the permitted uses in the zone. Thus, the testimony of plaintiff's own expert gave credence to the reasonableness of assemblage as a consideration by a willing buyer in the Corridor area. Finally, the gate-keeping role that the courts performed in such cases as State v. Caoili, 135 N.J. 252, 262, 639 A.2d 275 (1994); State v. Gorga, 26 N.J. 113, 116, 138 A.2d 833 (1958); and Jersey City Redev. Auth. v. Mack Properties Co., 280 N.J.Super. 553, 563-64, 656 A.2d 35 (App.Div.1995), was unnecessary here because Brody's highest and best use did not depend upon overcoming some development or zoning impediment.
In sum, plaintiff's argument that it was entitled to a pretrial hearing on the admissibility of Brody's testimony or that Brody's testimony should have been excluded or stricken because it depended on a speculative assemblage of the Property is without merit.

*1196 II.
Plaintiff maintains that Brody's comparable sales should have been excluded from evidence because they were so dissimilar in condition to the Property as to be inadmissible. Plaintiff's argument must be viewed in the context of the parties' acknowledgment that the new Convention Center's proximity to the Property was an appropriate consideration for the jury in determining market value.
The trial court has "`a wide discretion' in determining the admissibility of sales sought to be relied [upon] as comparable." Ford Motor Co. v. Township of Edison, 127 N.J. 290, 307, 604 A.2d 580 (1992). "Ordinarily, the exercise of discretion by a trial judge in ruling on the admissibility of comparable sales is sustained on appeal." State v. Azzolina Land Corp., 101 N.J.Super. 103, 108, 243 A.2d 276 (App.Div.1968). As stated in County of Ocean v. Landolfo,
"Obviously, no two properties can be exactly alike, and no general rule can be laid down regarding the degree of similarity that must exist to make such evidence admissible. It must necessarily vary with the circumstances of each particular case. Whether the properties are sufficiently similar to have some bearing on the value under consideration, and to be of any aid to the jury, must necessarily rest largely in the sound discretion of the trial court, which will not be interfered with unless abused."
[132 N.J.Super. 523, 528, 334 A.2d 360 (App.Div.1975) (quoting 5 Nichols on Eminent Domain § 21.31, at 21-54 to 21-56 (3d ed.1971)).]
In Ford Motor Co., supra, a property tax valuation case, the Supreme Court was critical of the Tax Court's exclusion of four of the six comparables used by the taxpayer's appraiser. 127 N.J. at 307-309, 604 A.2d 580. The Court noted that the excluded sales were similar to the subject property (an automobile assembly plant) in that they were all large industrial facilities and several were in the same geographical area as the subject property. Id. at 308, 604 A.2d 580. The Court commented that if this had been a jury case, it would have been "hard pressed to sustain the exclusion of [the] comparables." Ibid. But it decided that because this was a case in which the fact-finder was a Tax Court judge, the error was harmless. Id. at 310, 604 A.2d 580.
Here, plaintiff argues that the sales used by Brody are not substantially similar because the purchasers were casinos (sales two, four, five, and six); or the purchaser was acquiring the property for an assemblage (sales one and three). Plaintiff also criticizes Brody for failing to make adjustments to the comparable sales in order to account for these differences.
In spite of the variations between the Property and the comparable sales properties, the trial judge did not abuse his discretion in admitting Brody's comparable sales. Brody's comparables had sufficient similarity to the Property so that they lent logical, coherent support to his opinion of the Property's value. The comparable sales Brody used were all of properties within Atlantic City, some of which were located within the Corridor area (sales one, three, and four). All of the sales, except arguably sale three, were of vacant land (like the Property) or land with buildings that were useless to the buyer and that the buyer intended to demolish.
As in Ford Motor Co., supra, these comparables contained enough similarities so that the judge properly admitted them into evidence. Indeed, under Ford Motor Co., the comparables here are similar enough to the Property, that it would have been error for the judge to have excluded them. The differences that plaintiff points out go to the weight of the evidence and not to admissibility. See 5 Nichols on Eminent Domain, supra, at § 21.3[1] (stating that the benefits of admitting comparable sales outweigh its disadvantages).
*1197 Unlike State v. Inhabitants of Phillipsburg, 240 N.J.Super. 529, 573 A.2d 953 (App.Div.1990), a case upon which plaintiff relies, the Property did not need contingent government approvals before it could be developed for its highest and best use. The Property was in the CBD zone, which allowed the greatest variety of potential uses and buildings of 220 feet in elevation. Thus, none of the comparables were in zones that provided more liberal uses. Accordingly, Phillipsburg is inapposite.
Plaintiff also relies on Landolfo, supra. Landolfo is not persuasive authority for excluding Brody's comparable sales either. First, in Landolfo the subject property did not have all the necessary government approvals for a subdivision as had the comparables. 132 N.J.Super. at 527, 334 A.2d 360. Here, the Property suffers from no such impediment as compared to the sales used by Brody. Second, in Landolfo, this court merely deferred to the trial court's discretion in excluding the evidence. Id. at 528, 334 A.2d 360. Here, plaintiff is asking us to overturn the trial court's discretionary decision to admit the comparables.
Plaintiff also argues that Brody's appraisal should have been rejected as unreliable because he failed to adjust his selected transactions to reflect the inevitable differences between the Property and the comparables. There is no doubt that under the comparable sales method of valuation, an appraiser may adjust the comparable for variations between the properties. Glenpointe Assocs. v. Township of Teaneck, 241 N.J.Super. 37, 48-49, 574 A.2d 459 (App.Div.), certif. denied, 122 N.J. 391, 585 A.2d 392 (1990). But that does not mean that comparable sales must be adjusted. Brody explained that he did not make any adjustments because he believed that the most important factor in determining land value in Atlantic City was location and he believed that the Property's location is as good as any of the comparable sales. The Property is close to the Convention Center, which Brody said will create a large amount of pedestrian traffic. Plaintiff vigorously cross-examined Brody on his lack of adjustment. We conclude that Brody's failure to adjust the comparables goes to the weight rather than to the admissibility of this evidence.
In sum, the judge properly admitted into evidence the comparable sales used by Brody in arriving at the value of the Property.

III.
Before trial, plaintiff moved to extend the time to serve expert reports, so that it could serve the rebuttal report of Angelo V. Stambules. Plaintiff hired Stambules to do a study on the economic feasibility of building a hotel in the Corridor area of Atlantic City. Plaintiff explained in its motion brief that it retained Stambules to rebut Brody's appraisal, which, according to plaintiff, depended on the Property being assembled and developed as "a major commercial establishment [such] as a non-casino hotel." Judge Winkelstein, who was responsible for case managing this case and several other related cases, denied the motion on the ground of relevancy. The motion was denied again by the trial judge. We find no error.
Contrary to plaintiff's contention, Brody never testified that the Property's highest and best use was as a hotel. Rather, Brody testified "that the highest and best use of" the property was a use conforming to the applicable zoning, "taking advantage of the proximity[ ][and] the location of that property[ ] to both the Convention Center and to the casinos and Boardwalk." Moreover, Brody used the market approach to valuation. There is no evidence that any of the comparable sales Brody used were of property bought with the intention of building a hotel. Many of the comparable properties were used as parking lots after purchase (sales number two, four, and six). Accordingly, the Stambules report, which was proposed to rebut Brody's anticipated testimony, was irrelevant for that purpose.

*1198 IV.
Plaintiff also contends that "the trial court gave short shrift to [the] highest and best use in its charge." The judge gave the following charge on highest and best use:
Now, the fair market value of the property is not necessarily limited to what the owner actually used the property for. The uses to which an owner may realistically and legally put the property is one of the first things to consider in arriving at its value. A property that's been used for a modest one-family home or house would probably be worth more if it were used for some profit-making enterprise such as an apartment house or an office building or a factory. But in arriving at the fair market value, you should consider the highest and best use to which the property can be put. In other words, to determine fair market value, you should consider the uses which would prompt a buyer to pay as much as the owner might reasonably expect to receive from selling that property. You must decide what the highest and best use of the property is, but you must be realistic. In considering whether a use advanced by either party is the property's highest and best, you must determine if the property is suitable for that use or whether anybody would want it for that use.
This instruction is substantially the same as the model charge on highest and best use. Model Jury Charge (Civil), § 10.11A CondemnationHighest and Best Use (Apr.1996).
On appeal, plaintiff fails to specify how the instruction given by the judge was in error, or what language it wanted included in the charge. At trial, plaintiff requested a more elaborate highest and best use charge which included the following language: "The defendant contends that the value of the property may be determined in light of a special or higher use of the land when combined with other parcelsthat is, an assemblage." As discussed earlier, defendants' appraisal of the Property was not dependent on assembling the Property with other parcels.
"When reviewing a trial court's instruction to the jury, an appellate court must read the charge as a whole" and should not reverse "when the charge adequately conveys the law and does not confuse or mislead the jury." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418, 690 A.2d 575 (1997). A litigant is not entitled to a charge in his or her own words, only to a charge which does not, on the whole, contain prejudicial error. Mohr v. B.F. Goodrich Rubber Co., 147 N.J.Super. 279, 283, 371 A.2d 288 (App.Div.), certif. denied, 74 N.J. 281, 377 A.2d 685 (1977). Given these principles to guide our review, we find no error in the charge.

V.
Plaintiff argues that Judge Winkelstein erred in denying plaintiff's application to serve a supplemental report from its expert, Mancini, dated May 1, 1997. Plaintiff claims that the supplemental report was timely and structures its argument in the context of Rule 4:73-11(b). Plaintiff argues that the supplemental report was submitted more than forty days before the date fixed for trial, and, thus, complied with the rule. Plaintiff's argument, however, overlooks the fact that the service of the report was in violation of a case management order entered by Judge Winkelstein approximately one year earlier on May 26, 1996. That order required plaintiff to serve supplemental expert reports before February 1, 1997. When plaintiff moved to relax the time limits set forth in the order, Judge Winkelstein denied the motion saying:
As to the additional comparable sales and the subsequent report by ... [Mancini], I'm satisfied that there is no basis to allow that at this time. We first had a management conference in this case in May of 1996. There were *1199 some deadlines set forth for presenting the experts' reports. The condemning authority has had years to prepare its evaluation. I believe that the property itself was taken sometime back in March or April or May of 1995. It's been a couple of years that the landowners have been without their property in this case, and it really doesn't seem fair that on the eve of trial, and trial is scheduled for September, ... that the condemning authority can now come in with 30 new comparable sales to say, see, here, we were right in the first place.
It seems to me that the government has an obligation to rely on the early comparable sales; once they get the comparable sales of the property owner, they can't say to themselves, boy we were way off on that, let's go get some new ones to justify our initial evaluation. I don't think that's appropriate and I think that is the result of what would happen here if I allowed an additional 30 comparable sales to be used by the CRDA [plaintiff]. Also, it would result in excessive delay. These property owners have been without their property for an inordinate amount of time.
I understand that they may be compensated and interest may be paid to make them whole at some future time, but as a practical matter if they are entitled to additional money, which they may or may not be, they should be able to get it as soon as possible.
We tried to set out a discovery schedule that everybody could live with in this case. I think we have done that. I've given everybody sufficient time. We're really talking a couple of years since the properties were taken. It's time to get these cases over, it's time to get these cases tried.
I, therefore, respectfully decline to allow the use of the report containing additional comparable sales.
The right of a trial court to manage the orderly progression of cases before it has been recognized as inherent in its function. See Abtrax Pharm., Inc. v. Elkins-Sinn, Inc., 139 N.J. 499, 519-20, 655 A.2d 1368 (1995) (explaining that evidentiary hearings are unnecessary where there has been extensive discovery and briefing sufficient to render "a fully informed determination of the underlying issue"). Accordingly, it was well within the trial court's prerogative to restructure the timing for service of experts' reports.
The critical question presented, however, is whether the judge abused his discretion in refusing to extend the time limit imposed. That analysis requires an understanding of the context in which the order was entered. This condemnation proceeding was but one of many such proceedings stemming from plaintiff's exercise of its power of eminent domain in the Corridor extending from the new Convention Center to the boardwalk. Case management under such circumstances was important to allow the court to create an orderly presentation of the numerous cases from the point of view of its resources as well as the plaintiff's. Plaintiff did not object to the entry of the order. Indeed, in a letter dated July 19, 1996, plaintiff acknowledged that, as a result of a conference call with the judge and defendant, it would provide "updated appraisal reports" by November 1, 1996 and defendants would provide their appraisal reports by December 15, 1996.
Plaintiff offers no valid reason why the nine month period provided in the case management order was insufficient to submit any supplemental appraisal report it thought was relevant to the proceeding. Nine of the twenty-four sales mentioned in the supplemental report took place at least two months before Mancini's April 1996 original report. It is unclear why Mancini chose not to use those comparables in his prior report, and there is no explanation why they could not have been submitted in a supplemental report within the time constraints of the case management order. Further, out of the twenty-four sales, nineteen *1200 of them took place after the relevant valuation date of June 30, 1995, and twelve of them took place more than a year after that date. Considering the time required to analyze the twenty-four sales by defendants' expert and the preparation of a supplemental report by him, the probable motion practice generated by questions concerning the admissibility of post-valuation date sales,[3] and the preparation necessary for the then scheduled trial date of September 1997, we agree with defendants that allowing a relaxation of the case management order would have been unfair. Plaintiff has failed to demonstrate that the motion judge abused his discretion in refusing to allow the late amendment.

VI.
Plaintiff contends that the judge erred in preventing its appraiser Thomas P. Welsh from testifying about the Property's highest and best use. Welsh testified during plaintiff's case-in-chief about the general meaning of the term "highest and best use" of a property. Then, he began to testify more specifically about how to determine highest and best use:
For many parcels of land, however, achieving the highest and best use requires some change or improvement. That would mean that rather than just a parking lot, if you're going to put something on iti.e., an office building or a hotelin order to reach its highest and best use....
....
The appraiser must determine the type and characteristics of the improvement to be constructed. This is so that you don't have just pure speculation. You have to be specific. For example, should the parcel of land be improved with an office building, a retail building or a hotel? How do you determine it?... If an office building would be the highest and best use, how many stories? How many offices? What kind of income would it generate? What kind of expenses?
At this point in the testimony, defendants' counsel objected on the ground that plaintiff was trying to introduce the land residual theory of valuing vacant land.
The trial judge agreed with defendants and struck the portion of Welsh's testimony that intimated that in order to value the land it is necessary to determine the type of building that can be constructed. He reasoned that under New Jersey law, the fair market value of vacant land cannot be determined through picking a possible use and then figuring the rate of return and comparing it to the costs. While the quoted passage does not go into the detailed analysis that the land residual analysis entails, it is clear from the colloquy of counsel following defendants' objection that Welsh intended to pursue the subject in greater detail. Indeed, at the beginning of his testimony on the subject of highest and best use, Welsh said: "Traditionally, highest and best use analysis has been associated with land residual analysis, and basically the highest land value that is indicated represents the use which is the highest and best use."
In New Jersey, "a court will not permit an expert to testify to the value of vacant land based on the projected income which could be earned from the operation of a building which might be erected thereon, because such a valuation is too speculative." State v. F & J Partnership, 250 N.J.Super. 19, 26, 593 A.2d 352 (App.Div.1991) (citing State v. Mehlman, 118 N.J.Super. 587, 592, 289 A.2d 539 (App.Div.1972); Port of N.Y. Auth. v. Howell, 68 N.J.Super. 559, 568-69, 173 A.2d 310 (App.Div.), certif. denied, 36 N.J. 144, 174 A.2d *1201 927 (1961), overruled on other grounds, Housing Auth. of Newark v. Norfolk Realty Co., 71 N.J. 314, 364 A.2d 1052 (1976)). While ordinarily it is the landowner who attempts to offer such proof to maximize the value of the condemned property, here the testimony was being offered by the plaintiff-condemnor in an effort to prove that one of the permitted uses in the zone would probably not be pursued by the hypothetical willing buyer because it would not be economically productive. Such testimony has the same infirmities when offered by the condemnor to lower value as it does when it is offered by the condemnee. Welsh's proposed testimony on this subject violated our long-standing New Jersey appellate law on the subject, which is in accord with the majority view. James D. Eaton, Real Estate Valuation Litigation, 70-72 (1982).

VII.
Plaintiff contends that the trial judge placed unwarranted limitations on its cross-examination of defendants' appraiser, Brody.
The following principles of law guide us in our examination of each of the arguments presented. "[A]n expert witness is [ ] subject to searching cross-examination[,]... subject to reasonable limitations imposed by the trial court...." DaGraca v. Laing, 288 N.J.Super. 292, 302, 672 A.2d 247 (App.Div.), certif. denied, 145 N.J. 372, 678 A.2d 713 (1996); Glenpointe Assocs., supra, 241 N.J.Super. at 54, 574 A.2d 459 (citing Landolfo, supra, 132 N.J.Super. at 528, 334 A.2d 360). "[O]rdinarily, the scope of cross-examination of a witness rests in the discretion of the trial" court and a decision to limit cross-examination will not be disturbed on appeal "unless clear error and prejudice are shown." Glenpointe Assocs., supra, 241 N.J.Super. at 54, 574 A.2d 459 (citing Janus v. Hackensack Hospital, 131 N.J.Super. 535, 540, 330 A.2d 628 (App.Div.1974), certif. denied, 67 N.J. 95, 335 A.2d 47 (1975)). With regard to collateral matters, the extent of cross-examination is measured by the trial judge "in light of the effect such examination may have upon substantial justice." Id. at 54-55, 574 A.2d 459.
Plaintiff's counsel cross-examined Brody about his comparison sale number one, a property located in the Corridor area, which Energy and Minerals bought in 1990 for $600,000, or $87 per square foot. Defendants objected, claiming that the cross-examination was irrelevant to the value of comparison sale one. Plaintiff argued that the testimony was relevant because plaintiff hypothesized that Energy and Minerals bought comparison property one to protect its cleanup obligation at the bus parking lot. Plaintiff conceded, however, that it could present no evidence that Energy and Minerals needed comparison property in order to facilitate the cleanup of the bus parking lot. The judge sustained the objection. The judge did not abuse his discretion. As he explained, without evidence establishing that Energy and Minerals needed comparison property (the subject sale) in order to help the cleanup of the bus parking lot, this portion of Brody's cross-examination was irrelevant.
Plaintiff's counsel asked Brody:
Q Now, in your highest and best use conclusion, you do not describe a specific development plan for Lustgarten [defendants]; isn't that true?
A That is correct.
Q And in terms of your concept of assemblage of Lustgarten, you haven't described what the size of that assemblage would be; isn't that true?
At this point, the judge sustained defendants' objection. He reasoned that Brody had valued the Property on the basis of comparable sales and not on the basis of an assemblage or a specific use. Thus, plaintiff could not attack Brody's valuation by questioning him as to the specifics of a possible assemblage.
*1202 We agree with the trial judge. As discussed earlier, Brody testified that his valuation of the Property did not depend on it being assembled with other parcels. Accordingly, questions on cross-examination concerning the details of a hypothetical assemblage were beside the point.
Brody testified on cross-examination that several studies written by major accounting firms found that the Corridor section, after the completion of the Convention Center, would experience the greatest growth of any section of Atlantic City since the opening of the casinos. Plaintiff's counsel asked Brody whether these studies contained any feasibility analysis. The judge sustained defense counsel's objection to this question, commenting: "The economic feasibility is determined by the comparability of the sales that are being used."
We believe the judge should have allowed this inquiry. It was proper cross-examination as it impacted on the worth of Brody's reliance on the studies. We cannot say, however, that the error on this narrow point was so significant as to have warranted a new trial. Nonetheless, on retrial, the trial judge should permit the inquiry.
Plaintiff sought to question Brody about sales which took place in 1995 and 1996 in an area adjacent to the corridor. Some of these sales were included in Mancini's supplemental report which was excluded from evidence. The judge precluded the inquiry because these sales took place after the relevant valuation date and were, therefore, irrelevant. As mentioned earlier, post-taking sales have limited probative value and "should be used only under the most restricted conditions." Phillipsburg, supra, 240 N.J.Super. at 546, 573 A.2d 953. In light of the suspicion with which such post-taking sales are viewed in the law, the judge did not abuse his discretion in prohibiting cross-examination regarding these sales.
On cross-examination, plaintiff's counsel attempted to undermine Brody's testimony that the Property's location was just as desirable as that of his comparable sales located on Pacific Avenue, across the street from the casinos. To that end, plaintiff's counsel asked Brody the following question: "Didn't you at some point express an opinion that property in front of the Trump garage here in Block 41, for locational attributes alone, was twice as good as property in Block 151 which is directly across from the Convention Center?" Defendants objected.
At side-bar, plaintiff proffered that in a previous appraisal of a property directly across from the Convention Center, Brody had adjusted a property "in front of the Trump garage" downwards by 50 percent. Defendants countered that the appraisal date in the previous case was 1993, when the Convention Center was not as much of a factor in the real estate market. In response, the judge had plaintiff's counsel question Brody at side-bar whether he thought the market conditions were the same in 1993 as in 1995. Brody said that the market changed between 1993 and 1995 because in 1993 "there was some question as to the legitimacy of the Convention Center with the authenticity of it really happening[ ] and it's with those factors that the world in Atlantic City changed as of that time period." Brody admitted, however, that ground was broken for the Convention Center "sometime in `93."
The judge excluded the cross-examination stating:
We're going to have to spend at least forty minutes with this jury, comparing the two markets, dealing with the sales, bringing in the other sale[s]. It's true this is an attack on credibility, and generally credibility attacks are not collateral, but we already have substantial testimony in this case and a substantial attack on this witness ... with respect to his failure to make locational adjustments. The amount that this jury is *1203 going to get from this line of attack is so minimal and cumulative with what's already been done that there's no benefit in doing it.
From the judge's statement of reasons, it appears that he excluded the testimony in reliance of the discretion afforded him by N.J.R.E. 403. Under that rule, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence." In our view, the issue is a close one. As Brody acknowledged, ground was broken for the Convention Center some time in 1993. The subject matter of the cross-examination is highly probative if the fact finder were to conclude that the Convention Center had impacted the value of real estate in the corridor during the relevant period of Brody's appraisal. It appears that the trial judge accepted Brody's explanation at face value. We are not as sanguine in accepting his statement based on the record before us. The matter should be more fully explored in a N.J.R.E. 104 hearing on remand.

VIII.
Plaintiff asserts that defendants' counsel made improper remarks during his opening and closing statements and during his examination of witnesses, which prejudiced plaintiff's right to a fair trial. We have reviewed plaintiff's arguments and find no merit in them. Plaintiff failed to enter objections as to several of the now-contested matters in both the opening and closing statements. In any event, we find no error in the comments of counsel that would warrant a new trial. As to matters where plaintiff objected to defendants' examination of witnesses and in defendants' summation, we find that the trial judge's curative instructions were adequate in erasing any prejudice. See State v. Manley, 54 N.J. 259, 270-71, 255 A.2d 193 (1969) (a jury is assumed to have faithfully followed a judge's instruction).

IX.
Lastly, plaintiff contends that the judge erred in preventing Welsh from testifying as a rebuttal witness on the weaknesses in Brody's appraisal. Plaintiff proffered that Welsh would testify in accordance with his February 3, 1997 report, in which he criticized Brody's appraisal report. Excluding Welsh's comments in his report concerning land residual analysis, the report faulted Brody for not giving factual support for his opinion that the Atlantic City real estate market was flat between 1988 and 1993. He further criticized Brody for failing to adjust any of the comparable sales because "[t]he significant variation in sales prices per square foot would indicate at face value that the comparable sales are not true comparables to the subject property. To imagine that no adjustments are required to the 6 sales and one listing severely reduces the credibility of Mr. Brody's analysis." Welsh also found that Brody's sales numbers two, four, and five should not have been used for comparables because they were purchases by a casino for casino use or parking to support a casino's facility.
The judge barred Welsh's rebuttal testimony:
[A]s I understand, Mr. Welsh is prepared to testify that ... he believes that the report of Mr. Brody or the testimony of Mr. Brody was not in accordance with accepted standards. That's equivalent to saying "you ought not to be giving any credence to the report or to that testimony." And it is the opinion of another appraiser that the opinion of another appraiser is no good but without specific reference to the materials being used. He [Brody] should have investigated more? We've got that. This jury has heard substantially that Mr. Brodyhas heard the condemning authority's contention that Mr. Brody did not investigate sufficient [sic], that he didn't *1204 make sufficient adjustments. That's a matter that the jury ultimately has to determine, and although clearly the witness is not barred from testifying it's the ultimate issue, this is really an opinion with respect to credibility. I will bar Mr. Welsh's testimony to that event.
Plaintiff raised the issue of the exclusion of Welsh as a rebuttal witness again in its motion for a new trial. The trial judge again rejected the argument for the same reasons.
We recognize that "the trial court has a wide range of discretion regarding the admissibility of proffered rebuttal evidence." Weiss v. Goldfarb, 295 N.J.Super. 212, 225, 684 A.2d 994 (App.Div.1996), rev'd in part on other grounds, 154 N.J. 468, 713 A.2d 427 (1998). Welsh's testimony, however, was neither cumulative nor repetitive of testimony offered in plaintiff's case. Allison v. Bannon, 128 N.J.L. 161, 162, 24 A.2d 363 (E. & A.1942). Further, the proposed testimony both challenged and contradicted testimony produced for the defense. State v. Provoid, 110 N.J.Super. 547, 557, 266 A.2d 307 (App.Div.1970). No special rules concerning rebuttal testimony apply to condemnation cases. See State v. S. Nalbone Trucking Co., 128 N.J.Super. 370, 378, 320 A.2d 186 (App.Div.), certif. denied, 65 N.J. 575, 325 A.2d 708 (1974) (stating that there was no error in permitting rebuttal testimony regarding comparable sales not included on lists that were exchanged prior to trial).
The judge clearly erred when he held that the rebuttal evidence would do little more than call into question Brody's credibility as it affected the weight of his opinion concerning the value of the Property. In Wyatt by Caldwell v. Wyatt, 217 N.J.Super. 580, 590, 526 A.2d 719 (App.Div.1987), we held that the trial judge erred in refusing to admit rebuttal evidence relevant to the witness' credibility. There, the defendant testified that the car accident was the result of brake failure, not her negligence. Ibid. In rebuttal, plaintiff sought to introduce testimony from a witness that the defendant had admitted she had "removed the brake pads following the accident." Ibid. We said: "This was clearly proper rebuttal testimony both to attack Wyatt's credibility and as substantive evidence that the accident resulted from Wyatt's negligence and not from brake failure." Ibid. See also Weiss, supra, 295 N.J.Super. at 222-26, 684 A.2d 994 (holding that it was error to disallow rebuttal testimony from the chairman of a hospital's nephrology department that would have contradicted the testimony of the defendant doctor in a malpractice case who testified that he was not required to obtain a consult from a cardiologist for a certain procedure where the plaintiff he was dialyzing had a history of cardiac condition); Garafola v. Rosecliff Realty Co., Inc., 24 N.J.Super. 28, 42-43, 93 A.2d 608 (App.Div.1952) (holding it was prejudicial error to refuse to permit plaintiff to testify on rebuttal that the miniature train he was riding swayed as it rounded a corner because the testimony would have contradicted testimony presented by defendant that the train did not sway).
Here, as in Wyatt, Weiss, and Garafola, the trial court's decision to exclude Welsh's rebuttal testimony was an abuse of discretion. Welsh was prepared to testify as to the flaws in Brody's appraisal method. This testimony was highly relevant to support plaintiff's challenge to defendants' crucial evidence as to the value of the property. The trial judge seemed to reason that because some of the same criticisms of Brody's technique were raised during plaintiff's cross-examination of Brody, Welsh's rebuttal was repetitive or unnecessary. However, an attorney's comments do not constitute evidence at trial. Welsh's rebuttal testimony would arguably have supplied appraisal standards from an expert witness that may have affirmed in the jurors' minds the relevancy and legitimacy of plaintiff's counsel's cross-examination of Brody. The judge instructed the jury about this legal truism during his final instructions. Because of the exclusion *1205 of Welsh's rebuttal testimony, there was no evidence in the record, for example, that Brody's failure to adjust for time or markets might have resulted in an inaccurate valuation. Where a rebuttal witness, such as in this case, is prepared to offer non-repetitive, substantive testimony that directly attacks the value of defendants' expert testimony, we are of the view that the exclusion of such testimony has the capacity of producing an unjust result. R. 2:10-2. The error requires a new trial.
The judgment under review is reversed and the matter is remanded for further proceedings in accord with this opinion.
NOTES
[1] As to any arguments that plaintiff may have presented in its brief that are not specifically addressed herein, the parties may assume that no error was found and that a discussion was unnecessary since it would not be of assistance to the trial court on remand.
[2] This property is the subject of a separate appeal, Casino Reinv. Dev. Auth. v. Atlantic Plate & Window Glass Co., No. A-2308-98T3, calendared back-to-back with the instant case.
[3] As to the use of post-valuation date sales, see Glen Wall Assocs. v. Wall Tp., 99 N.J. 265, 283, 491 A.2d 1247 (1985) (holding that sale of property sold less than three months after the date of assessment should have been considered) and Inhabitants of Phillipsburg, supra, 240 N.J.Super. at 546, 573 A.2d 953, ("post-taking sales should be used only under the most restricted conditions").